# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2007-CA-00886-SCT

*JENNIFER McDONALD*

*v.*

*MICHAEL STEVEN McDONALD*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/15/2007 |
| TRIAL JUDGE: | HON. DAN H. FAIRLY |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | JAMES W. CRAIG |
| | DALE DANKS, JR. |
| | KIMBERLY PINE TURNER |
| ATTORNEYS FOR APPELLEE: | MARTY CRAIG ROBERTSON |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 06/17/2010 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

## CONSOLIDATED WITH

## NO. 2008-CA-00240-SCT

*JENNIFER McDONALD*

*v.*

*MICHAEL STEVEN McDONALD*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/22/2008 |
| TRIAL JUDGE: | HON. DAN H. FAIRLY |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | JAMES W. CRAIG |
| | DALE DANKS, JR. |
| | KIMBERLY PINE TURNER |
| ATTORNEYS FOR APPELLEE: | MARTY CRAIG ROBERTSON |
| NATURE OF THE CASE: | DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 06/17/2010 |
| MOTION FOR REHEARING FILED: | |

MANDATE ISSUED:

**CONSOLIDATED WITH**

**NO. 2008-CA-01484-SCT**

*JENNIFER McDONALD*

*v.*

*MICHAEL STEVEN McDONALD*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/20/2008 |
| TRIAL JUDGE: | HON. DAN H. FAIRLY |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | JAMES W. CRAIG |
| | DALE DANKS, JR. |
| | KIMBERLY PINE TURNER |
| ATTORNEYS FOR APPELLEE: | MARTY CRAIG ROBERTSON |
| NATURE OF THE CASE: | DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 06/17/2010 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRAVES, P.J., RANDOLPH AND PIERCE, JJ.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1.     These three consolidated cases involve custody of children born to Michael Steven

McDonald ("Steve") and Jennifer Lee Mallory McDonald ("Jennifer"), and related issues

regarding child support, visitation, child-abuse allegations, jurisdiction, and the role of a

guardian ad litem ("GAL").

**FACTS AND PROCEDURAL HISTORY**

¶2.    Two sons[1] were born of the marriage.  Douglas was born more than three months premature on March 29, 2000.  Blake was born on March 16, 2001.  In September 2002, Steve was convicted of possession of cocaine with intent to sell for a crime committed in 1998.  He was sentenced to thirty years, all suspended; five years' probation; and a fine of $3,000.  The couple separated in May 2003.  An irreconcilable-differences divorce was granted in October 2003 in the Chancery Court of Rankin County.  An agreed settlement gave Jennifer custody of the boys, and Steve's visitation also was agreed upon.  Child support was set at $520 monthly, plus one-half of the boys' (1) health insurance; (2) out-of-pocket medical expenses; and (3) day-care costs.  Also, Steve agreed to pay marital debt for four specified accounts.

**CASE ONE**

¶3.    In the first year after the divorce, Steve did not pay the full amount of child support consistently, and did not comply fully with other requirements of the agreement.  In June 2004, Jennifer filed contempt proceedings against Steve.  Subsequently, Steve moved to reduce the child-support amount and, on the advice of his then-attorney, began paying $300 per month.  He paid that amount consistently for a year.  In October 2005, he began paying $520 per month.  From that date forward, with the exception of two months (which was made up in subsequent payments), Steve timely paid the $520 per month.  However, he did not pay arrearage, which Jennifer claimed exceeded $5,000 in child support and $10,000 overall.

---

[1]The names used here for the children are not their real names.

3

¶4.   In March 2006, while these matters were pending, Jennifer moved to modify visitation, alleging physical and sexual abuse by Steve.  Jennifer claimed that Douglas told her that Steve had "dragg[ed] him by the hair to the bathroom and bit[] him on the penis." Douglas's pediatrician, Dr. Julia Sherwood, found no physical evidence of sexual abuse and regarded the claim as a "fantasy story."  Personnel at the Child Advocacy Center ("CAC") did not believe the allegation.  The court appointed Dr. Darryl Wheat,[2] who opined that the story originated from an incident involving Douglas's brother, who had been bitten through his pants by another child at their day-care center.  Jennifer's second allegation arose from an incident in which Blake claimed that a red mark on his neck had come from his father choking him with a bed sheet.  Steve offered that he was trying to get Blake to go to bed and that he kept getting back up.  After at least four attempts, Steve tucked the bed sheet firmly around Blake, but when the child complained, Steve loosened the sheet.  Dr. Sherwood described the red mark as "a very light abrasion."  CAC personnel believed Blake's story was credible, but opined that the event was an isolated incident of inappropriate discipline.  A social worker for the Rankin County Department of Human Services ("Rankin County DHS") accepted Steve's explanation.  Nonetheless, Jennifer's modification motion was granted, and Steve's visitation was restricted.  Later, supervised visitation was allowed, and by October 2006, full visitation had been restored.

¶5.   In August 2006, Steve moved to modify custody, alleging that a material change of circumstances had occurred that was detrimental to the boys, and that he should be awarded

---

[2]Ph.D., L.C.S.W.

custody. Jennifer renewed her contempt motion. Hearings were held in March, April, and May of 2007.

¶6. The chancellor heard the contempt motion first, and found Steve in contempt, describing his prior conduct as "willful and contumacious, . . . reckless . . . [and] callous." The chancellor attributed his difficulty in determining the amount of the arrearage to Steve. He found Jennifer's testimony more credible and accepted her calculations. The chancellor ordered Steve to pay the judgment within forty-five days of the order. The chancellor then declared that the judgment had cleansed the contempt, and proceeded with the modification motions.

¶7. Steve averred that the boys had behavioral, developmental, educational, medical, and psychological problems that Jennifer was not adequately addressing, and that she was overwhelmed, overindulgent, and in denial. At the hearing, it was established that the boys had been dismissed from three separate day-care centers. Douglas was repeating kindergarten, and Blake was in danger of failing kindergarten. The behavioral problems exhibited at school and/or day care included: biting, kicking, choking, and hitting other children and each other. The boys were described as being generally out of control when they were with Jennifer. Blake had been hospitalized for psychiatric treatment. He was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") and an adjustment disorder with disturbance of emotions and conduct, possibly combined with a mild form of autism. Douglas, who was physically smaller (related to his premature birth), was described as a follower of Blake, imitating his behavior. Douglas was diagnosed with an adjustment disorder with anxiety, excessive fear, and ADHD. Steve claimed that Jennifer had (1)

5

refused to follow the doctors' orders, (2) failed to fill a prescription for Blake's medicine, (3) taken Blake off a medicine without a doctor's permission, and (4) misapplied their medicines, thus causing injury.

¶8. The chancellor heard testimony from both parents, Dr. Wheat, a GAL, a day-care director, two schoolteachers, and Steve's wife, Danna, whom he had married in 2005. Exhibits included report cards, behavior calendars, attendance reports, and discipline reports. The day-care director testified that she and her employees had had difficulty with the boys' behavior, including biting, kicking, and hitting other children and teachers, resulting in the boys' dismissal. She testified further that she spoke to Jennifer several times by phone, but to no avail. Finally, she met with Jennifer, at which time she decided that she would have to ask the boys to leave, because Jennifer "denied that any of it happened and did not seem to want to work with [her].'" Douglas's special-education teacher testified that Douglas was developmentally delayed. She stated that Douglas sometimes "overflows" with "information" such as, that (1) his "mom cries all weekend when we're at my daddy's because she's scared he'll kidnap us and she'll never see us again," and (2) "Dad put Mom in jail and it's all his fault." The boys' kindergarten teacher testified that Blake, for several weeks upon arrival in her class, had been "very aggressive, angry, moody, withdrawn if corrected," but that he had improved recently, and that if he continued to improve he would be able to advance to the first grade. She testified that Blake had been on and off various medicines during the school year. She added that Blake's behavior had improved after positive reinforcement was used, and that he had begun taking Atarax daily at school.

6

Douglas was in the same class and was doing much better academically in his second year of kindergarten.

¶9. When Jennifer testified regarding the boys' behavior problems, she was asked about nine specific instances of misbehavior documented in Blake's school records. She denied any knowledge of seven of them, even though she had initialed the reports. Jennifer admitted that she had not filled a prescription for Blake's Focalin medicine in more than four months. She admitted to being overwhelmed by the boys' problems and noted that their anxiety and depression had started as early as 2003, when Douglas was three. She admitted that she previously had been in denial regarding the boys' problems, yet she continued to deny any behavior problems at the day-care centers, blaming any problem on alleged abuse by center personnel. Regarding Blake's misbehavior at day care, she stated, "My child hated going there. And why should he not act out?"

¶10. Dr. Wheat submitted a report and testified. His assessment of Blake after twenty-eight sessions over a six-month period included the following:

> [Blake] has a long history of being disruptive, non-compliant, a disregard for parental correction. After being discharged from the hospital he has shown some improvement at school and at the separate home[s] of Jennifer and Steven McDonald. However, he still has severe behavioral problems, is highly non-compliant (disobedient), exhibits frequent and severe tantrums, is immature and lagging in development. He definitely continues to need medication and close parental supervision. The parents need to acknowledge the need for and acquire scientific behavioral strategies and psychological interventions.

Dr. Wheat stated that Blake needs his parents to be "absolutely firm in their demand and expectation of compliance. This is serious and must be corrected in his formative years, preferably before first grade."

¶11. Dr. Wheat described Jennifer's relationship with the boys as follows:

> I think Jennifer tried to do everything she could to stop the non-compliant behavior of the children. Since she was unable to modify the children's behavior it seems she began to deny the extent of the children's problems and over-protect them. This overprotection has interfered with the children learning new behavioral and social skills relevant to their age level. . . .
> . . .
> I confronted her regarding the need to face reality, the severity of [Blake]'s mental condition and need for parental intervention and that her denial and rationalization of [Blake]'s behavior was unhealthy, unacceptable and unsupportable.

Dr. Wheat went on to note some of the ways Jennifer had begun to improve in the early months of 2007. Dr. Wheat described Steve as being "somewhat rough and terse with the children. He relied heavily on corporal punishment and less on teaching them skills. I think he felt very frustrated that the children were highly non-compliant and, after being corrected by him wanted 'to go back home to Momma.'" However, after a few sessions, as of February 2007, Steve had made "considerable improvement," and had "begun to stop their negative behavior quickly, teach new skills and use much more positive reinforcement." Dr. Wheat described Steve's marriage as "hav[ing] had a positive effect on him in many ways. . . . [H]e has relied more on his wife in assisting him with the children versus his mother." Regarding custody, Dr. Wheat recommended that Jennifer retain physical custody, but said it was a very close call, "52/48." He also recommended that the court "strongly consider joint legal custody" and granting Steve significantly increased visitation.

¶12. The GAL submitted a report, testified, and questioned witnesses. She recommended that physical custody be granted to Steve, but acknowledged also that it was close, "51/49." She offered her reason for disagreeing with Dr. Wheat: "[He] said that [Jennifer was] going

8

to need probably a year's worth of therapy herself . . . to find out why she's been so permissive . . . . I don't know that waiting a year for her to complete therapy is the best thing for these kids." The GAL report included the following: (1) the boys' behavior was out of control when Jennifer brought them to the CAC; (2) the boys were dismissed from Trinity Life Day Care, but Jennifer claimed it was because the center did not have personnel capable of caring properly for active children; (3) the boys were dismissed from Old Fannin Preschool after Jennifer made multiple reports to DHS; (4) Blake was suspended from his after-school program for calling a girl a "bitch"; (5) one employee at the boys' after-school program reported that Blake was one behavioral offense away from being dismissed. The GAL made scheduled visits to see the children in the homes of both parents. Also, she made two surprise visits to Steve's home. On the visit to Jennifer's home, Blake's behavior was out of control. Jennifer attempted to put Blake in a time-out, but he returned and continued to misbehave. The GAL described her visit to Steve and Danna's house as follows, "the difference between the children at Jennifer's and the children at Steve's was so great. I mean just remarkable . . . unbelievable . . . . Everything I'd heard about them, they were different children at Steve's." After Jennifer suggested that the children may have been drugged prior to the scheduled visit, the GAL made two unannounced visits to Steve's house, and was impressed with the boys' behavior each time.

¶13. The GAL provided additional factual information to assist the court in weighing the *Albright* factors. *See Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983). Included among this list were the following: (1) Steve is a salesman who travels out of town during the day, four days a week, but is home every night; (2) Jennifer is a licensed practical nurse

9

and works daytime hours locally for a home-health agency; (3) both parents are physically fit and neither reports any mental health treatment, other than the counseling by Dr. Wheat; (4) there have been no allegations of infidelity, alcohol abuse, or immoral activity, other than Steve's criminal record; (5) each party has a stable home life and employment.

¶14. At the close of evidence on April 4, 2007, the chancellor granted Steve's motion for modification, finding that there had been a material change of circumstances since the last custody decree, that the change had adversely affected the welfare of the boys, and that a modification of custody was in both boys' best interests. The chancellor awarded physical custody of the boys to Steve, beginning May 25, 2007. This delay was designed to give the boys a chance to finish the school year, and especially to give Blake a better opportunity to complete kindergarten successfully. Following his ruling from the bench, the chancellor admonished both parties to avoid telling the boys the details of what had happened in court to spare them from further harm. The chancellor granted liberal visitation to Jennifer, including overnight visits on Wednesdays during the school year. He also ordered an immediate resumption of the therapy sessions with Dr. Wheat for Steve, Jennifer, and both boys.

¶15. The chancellor found that, once the court moved to the modification hearing, "there was an abrupt change in the Court's assessment of the credibility of the parties." The chancellor found that Jennifer, "with regards to the problems of her children . . . was overwhelmed by it and . . . was in denial." The chancellor noted that some evidence pointed to recent improvements by Jennifer and the boys, but was persuaded that Jennifer showed in her testimony that she continued to be in denial. The chancellor referred to the behavioral

10

problems, dismissal from day-care centers, hospitalization, necessity of medications, and the false accusation of sexual abuse in his findings. "Since the date of divorce . . . the children just have not done well at all, certainly in the context of behavior, of conduct, and . . . emotionally." From these findings, the chancellor concluded that a material change of circumstances had occurred, and that it had had an adverse impact on the boys.

¶16. The chancellor analyzed the *Albright* factors in determining that a change in custody should be made. *See Albright*, 437 So. 2d at 1005. The chancellor found: (1) age of the children slightly favored Jennifer, as the boys were seven and six, but developmentally delayed; (2) sex of the boys favored Steve; (3) continuity of care favored the mother "greatly"; (4) capacity to provide primary childcare favored Jennifer, as she had a larger home; (5) other factors (employment of the parents, physical and mental health and age of the parents, emotional ties of parents and children, stability of home environment and employment of the parents) favored neither party; and (6) preference of the children was inapplicable.

¶17. The chancellor stated that the health of the children was the "biggest factor" he had to consider, and that it, along with the closely related factor of parenting skills, favored Steve. Other than noting that Blake's behavioral and psychological problems were worse than those of Douglas, the chancellor primarily analyzed the boys' best interests jointly. The chancellor noted that both parents were willing to care for the children, but was convinced by the GAL's "dramatic and startling" comparison of the children's behavior that Steve had the better parenting skills. In this analysis, the chancellor took note of the fact that Steve had matured, as evidenced by his marriage to Danna and his enrollment in college, achieving a

11

grade-point average of 3.89. The chancellor was impressed by the demeanor and confidence demonstrated by Steve and Danna during their testimony. The chancellor found that the moral-fitness-of-the-parents factor favored Jennifer, but only slightly. The chancellor noted that nine years had passed since Steve's crime occurred, and that "there's not a hint in evidence that he's continued . . . any further involvement in the drug world, the sale or use of drugs." The chancellor ended his analysis by recalling Dr. Wheat's testimony that the boys needed "a highly structured settled environment," particularly at the time of transition to elementary school. The chancellor concluded that Steve was better suited to provide such an environment, and that it would be in the boys' best interest to be in Steve's custody.

¶18. Prior to the planned date of custody transfer, Steve, citing newly discovered evidence, filed an emergency motion requesting that the boys be transferred immediately to his custody. At that hearing, many of the same witnesses testified again, joined by Dr. Sherwood. The boys' kindergarten teacher testified that, on the morning of April 5, 2007 (the day after the earlier hearing), Douglas told her that, after he went to live with his father, he would no longer see his mother, because "she's going to go to heaven." She also testified that, despite the hopes she had expressed at the previous hearing, Blake had not made sufficient academic progress and would not be advancing to first grade. She went on to say that Blake's behavior had been worse in the previous month, and that he had said in class that he planned to kill himself. Danna testified that on April 26, 2007, when the boys were visiting, she found Blake with a toy lizard wrapped around his neck. When she asked him what he was doing, he said that he was trying to kill himself.

12

¶19. Dr. Wheat testified that, after Douglas's "going to heaven" comment, he found Jennifer to be depressed, but not suicidal. He testified that when he later asked Jennifer why she had not complied with the court order to resume counseling, she replied that she had not received a copy of the order. Dr. Wheat testified that, when he attempted to set up a meeting with Steve, Danna, Jennifer, the GAL, and Dr. Sherwood regarding Blake, that Jennifer expressed reluctance to attend. At the meeting, which Jennifer did not attend, it was determined that Blake needed immediate psychiatric care. Dr. Wheat repeated his previous testimony that the boys, Blake in particular, needed stability, especially regarding their medications and psychological treatment. Dr. Wheat testified that the events since the previous hearing had changed his opinion, and that he now recommended that Steve be awarded immediate custody.

¶20. Dr. Sherwood testified that the situation with Blake and his medications was "the most confusing situation [she had] ever been in," because he had been on so many different medications and she was unable to get consistent reports on the effectiveness or side effects of the drugs. Regarding the period of time since the hearing on April 4, 2007, she stated that there had been a "deterioration" of his situation, and an "acceleration of the problem." She also testified that: (1) Douglas said to her that he wanted to kill himself; (2) Jennifer claimed that Blake was having hallucinations, but that when hospitalization was suggested, "the conversation changed to where that really wasn't a big issue." Following the report of hallucinations, Dr. Sherwood changed Blake's medication yet again as a precaution.

13

¶21. The GAL recommended that the boys be transferred immediately to Steve's custody. Steve testified that he had brought the motion to accelerate the transfer because of the talk of suicide and the fact that Blake's therapy had not resumed as ordered by the court.

¶22. Jennifer testified and denied having said anything to the boys about the previous hearing, or that they would be going to live with their father, or that she would be going to heaven. She explained that she had failed to comply immediately with the chancellor's instructions because the order was not date-stamped until April 27.

¶23. The chancellor granted Steve's motion for immediate transfer of custody. He was persuaded by the change in the testimony of the witnesses who had presented the most optimistic picture at the prior hearing that: (1) the boys' teacher had reported talk of suicide and that Blake would not advance to first grade, so the rationale for delaying transfer was no longer valid; and (2) Dr. Wheat had changed his custody recommendation. The chancellor made the following findings of fact: (1) Jennifer was not credible in her claim that she had not told the boys about the previous hearing; (2) Blake had made a suicidal gesture; (3) Jennifer had not abided by previous orders of the court, despite her attempt to "quibble" about date stamps. Jennifer appealed the chancellor's orders.

**CASE TWO**

¶24. In October 2007, Steve filed a complaint for modification to terminate Jennifer's Wednesday overnight visitation. He alleged that the visits had caused behavioral and emotional problems at school on Thursdays. The chancellor scheduled a hearing on this motion for January 2008. A few weeks after Steve's filing, the GAL moved for temporary modification, requesting that the Wednesday visitations be suspended until the January trial.

14

She added the following "most pressing concerns": (1) Jennifer was not applying the boys' medications properly; and (2) the boys had been late for school and disruptive in class on Thursdays. At the November 2007 emergency hearing, Steve testified, and the GAL presented an oral report. Steve stated that both boys had been prescribed Daytrana patches for their ADHD symptoms. The patches are designed to be placed on the hip early in the morning on school days to provide a constant dose throughout the day. Steve alleged that Blake had developed a rash because Jennifer had put patches on the same spot on consecutive days.[3] Photographs of the rash, taken primarily on Thursdays and Mondays after the boys' visitations with their mother, were admitted, showing rectangular red marks, some of which bordered on or overlapped each other. Steve testified that the boys had told him that Jennifer had let them put the patches on themselves in the car on the way to school. He stated that, one day when the boys came home from school, Blake did not have his patch on, and that Douglas's was still attached, but was "rolled up" like a "taco." The GAL's report included the following about the boys' behavior on Thursdays: (1) teachers reported tardiness and bad behavior, to the extent that one teacher had changed her class schedule to accommodate it; (2) a teacher reported that Douglas had told her that (a) his mother was sad, (b) his stepmother was evil, and (c) his father beat him, but that he never said such things on other days; (3) a teacher reported that one day it took until 1:00 p.m to get Blake to settle down; (4) the boys were doing well on other days and had satisfactory academic performance. The boys' school records confirmed that the boys had been late and disruptive on Thursdays, but otherwise were doing well in school.

---

[3]Douglas used a lower-dose patch and did not have a rash.

15

¶25. The chancellor granted the GAL's motion and ordered that Jennifer's Wednesday overnight visitations be halted temporarily, and reduced the visitation on Wednesdays to end at 7:00 p.m. A full trial never occurred, as the parties agreed that there was "no additional evidence to present to the Court since the hearing . . . and that the parties [had] agreed to a Modification . . . ." An agreed order of modification, as to content and form, was executed by the parties and the GAL, and was ratified by the court, and entered on January 22, 2008.

¶26. Jennifer had objected to the oral report of the GAL at the November 2007 emergency hearing as hearsay testimony from a nonexpert witness.[4] Jennifer's attorney argued that because the GAL had not filed a written report, he was "not in a position of being able to . . . attack the credibility of the report, and we strongly suggest that if there was something that the teachers needed to convey . . . that [they] should have been here." The GAL countered that she had met with Jennifer and her attorney and had told them what the teachers had told her. The chancellor overruled the objection, stating the following:

> [Counsel] has raised an objection . . . and that is, does the law – do the rules and/or the case law allow for a [GAL] to simply regurgitate what's been said to him or to her. The historical practice is that we allow it in the same way that we allow an expert to regurgitate hearsay. It's patently hearsay but – I'm going to allow it.

---

[4]A similar objection was made in case three, as discussed further below. The GAL was never qualified as an expert, before or after the objections. An order appointed the Honorable Monti Bishop as the GAL for "the said minor children." The order granted "authority to have access to all information with regard to said child, children or persons involved with the matter being investigated. This authority includes but is not limited to schools, law enforcement agencies, [CAC] and the [DHS]." A similar order was entered in case three.

This issue first arose prior to the entry of the order in case two. Jennifer asserts in her brief that the GAL not only offered hearsay testimony, but that she exceeded the proper role of a GAL by testifying, advocating, examining witnesses, submitting reports, and meeting ex parte with the chancellor throughout all proceedings, including case three.

**CASE THREE**

¶27. In April 2008, after Steve, Danna, and the boys had moved to Madison County, Jennifer filed a motion for contempt, and Steve counterclaimed for contempt. A trial date was set for May 29, 2008, in Rankin County Chancery Court. While these motions were pending, on May 14, 2008, Jennifer noticed a bruise on the back of Douglas's leg and accused Danna of physically abusing him. Jennifer claimed that Danna had beaten Douglas with a belt on his bare buttocks. Danna admitted that she had spanked Douglas with her hand while he was wearing pants. Danna and Steve explained that the bruise had come from a fall while Douglas was jumping on his bed. Jennifer phoned Rankin County DHS with the report and was referred to Madison County DHS, as the incident had occurred in that county.

¶28. On May 16, 2008, Madison County DHS requested and received from Madison County Youth Court Judge William Agin an oral order transferring custody of the boys to Madison County DHS, which then transferred them to Jennifer's custody.[5] A written custody-change order was issued the next week.[6] A shelter hearing was scheduled for May

[5]Following this order, the boys remained in Jennifer's custody until after the hearing in Rankin County on August 12, 2008. During that time, Steve and Danna were allowed four supervised visits.

[6]It was learned later that the written order was "digitally" signed on May 19, 2008, but was not filed until May 23, 2008.

21, 2008, but was never completed. Jennifer's attorney stated later that, before the shelter hearing could be conducted, Steve challenged the jurisdiction of the Madison County Youth Court. The jurisdictional issue was taken under advisement, and the parties were granted two days to submit authority. Both parties complied, but Judge Agin never issued a ruling. On May 22, 2008, Steve filed an emergency motion in Rankin County Chancery Court, requesting that court to assert jurisdiction over the abuse allegation. The chancellor stated later that, at that time, he was willing to defer to Madison County Youth Court, and that he had phoned Judge Agin and had let him know that, assuming that the matter would be handled expeditiously.

¶29.    However, after no action was taken in Madison County, Steve filed another motion in Rankin County Chancery Court on July 14, 2008, asking it to assert jurisdiction. The chancellor stated later that he attempted to call Judge Agin at that time, but that Judge Agin had "declined to communicate . . . any further." The chancellor issued his order asserting jurisdiction over the child-abuse allegation on July 28, 2008. In the order, the chancellor set a hearing date of August 12 and ordered the parties, as well as Madison County DHS and any law enforcement agencies that had investigated the matter to cooperate with the GAL in her investigation. On August 8, 2008, Judge Agin transferred the Youth Court record to the Rankin County Chancery Court. The day before the hearing, Judge Agin granted permission to the Madison County DHS personnel to testify in Rankin County Chancery Court.

¶30.    The chancellor heard the matter on August 12, 2008, and dismissed it, as he found Steve and Danna's story more credible. During this hearing, the GAL presented an oral report as she had done in case two. Jennifer objected to the GAL "testifying to anything

18

beyond her own personal knowledge," and asserted that the GAL had not rendered a report and was not qualified as an expert. The chancellor overruled the objection, adding that the GAL was unable to prepare a written report, given the lack of cooperation by the Madison County personnel. The chancellor admonished the Madison County DHS employees for their overreaction, followed by their inaction.

¶31. Regarding jurisdiction, the chancellor stated that the abuse allegation should have been filed originally in his court, as it had continuing jurisdiction over the children, as there was a custody-related action pending in that court at the time of the allegation. Even so, he repeated that he had been willing to defer on jurisdiction, but that Judge Agin had "relinquished jurisdiction by inaction." The chancellor noted that Judge Agin has been disciplined by this Court for his failure to act in a timely manner. *See Miss. Comm'n on Judicial Performance v. Agin*, 987 So. 2d 418 (Miss. 2008); *Miss. Comm'n on Judicial Performance v. Agin*, 17 So. 3d 578 (Miss. 2009). The chancellor found that, by issuing a custody-change order without completing a shelter hearing, Judge Agin had violated due-process requirements, as well as the statute governing these matters. *See* Miss. Code Ann. § 43-21-309 (Rev. 2009). Jennifer appealed from the order, citing the chancellor's assertion of jurisdiction.

**ISSUES**

¶32. The issues are as follows:

    I.    Whether it was error to proceed with Steve's modification motion after finding that the contempt judgment was cleansing.

19

II. Whether it was error to find that a material change of circumstances had occurred, justifying a change of custody of both boys.

III. Whether the chancellor improperly weighed and applied the *Albright* factors.

IV. Whether the guardian ad litem acted beyond her authority by offering hearsay testimony without being qualified as an expert.

V. Whether the Chancery Court of Rankin County properly exercised jurisdiction over the allegations of abuse raised in 2008.

## DISCUSSION

¶33. "A chancellor's findings of fact will not be disturbed unless manifestly wrong or clearly erroneous. . . . A chancellor's conclusions of law are reviewed de novo." *Lowrey v. Lowrey*, 25 So. 3d 274, 285 (Miss. 2009) (citations omitted).

**I. Whether it was error to proceed with Steve's modification motion after finding that the contempt judgment was cleansing.**

¶34. Jennifer argues that the chancellor committed legal error, misapplying this Court's precedent by acting upon Steve's modification petition after holding him in contempt. This argument is without merit, as this Court has held that a contemnor's hands are cleansed "by the entry of the final judgment . . . and that *from* and after *the date* of the final decree, the matter of modification of the previous divorce decree . . . may be revived . . . ." *Brennan v. Brennan*, 605 So. 2d 749, 753 (Miss. 1992) (emphasis added). Our courts have followed this precedent, consistently applying it to mean that a prior modification petition need not be dismissed and resubmitted, but may be ruled upon immediately after a cleansing judgment.

20

*See* **Howard v. Howard**, 968 So. 2d 961, 976 (Miss. Ct. App. 2007); **Cook v. Whiddon**, 866 So. 2d 494, 499-500 (Miss. Ct. App. 2004); **Lane v. Lane**, 850 So. 2d 122, 127 (Miss. Ct. App. 2002).

¶35.   Accordingly, we find that the chancellor did not err in acting upon Steve's modification motion after finding that the judgment had cleansed Steve of contempt.

> **II.    Whether it was error to find that a material change of circumstances had occurred, justifying a change of custody of both boys.**

¶36.   Jennifer argues that the chancellor overemphasized: (1) the boys' problems that occurred shortly after the divorce; and (2) the chancellor's own views, as well as those of the court-appointed experts, of the relative parenting skills of the parties.  She claims that the chancellor "ignored the evidence from 2006-07 – which was the only relevant proof of the state of the children at the time of the hearing."  She argues also that the chancellor failed to make specific findings applicable to each boy individually, such that it was error to find that the best-interests standard had been applied for both boys.

¶37.   This Court has stated repeatedly the noncustodial parent's burden and this Court's standard of review in custody-modification proceedings:

> [T]he non-custodial party must prove: (1) that a substantial change in circumstances has transpired since issuance of the custody decree; (2) that this change adversely affects the child's welfare; and (3) that the child's best interests mandate a change of custody.  A chancellor's finding of fact on such a matter will not be set aside or disturbed on appeal unless the finding is manifestly wrong or is not supported by substantial credible evidence.

**Bredemeier v. Jackson**, 689 So. 2d 770, 775 (Miss. 1997).  "[T]he material change of circumstances must be in the custodial home."  **Giannaris v. Giannaris**, 960 So. 2d 462, 469

21

(Miss. 2007). "[P]arental behavior that poses a clear danger to [a] child's mental or emotional health can justify a custody change." *Morrow v. Morrow*, 591 So. 2d 829, 833 (Miss. 1991). In determining whether a material change of circumstances has occurred, a chancellor should look at "'the overall circumstances in which a child lives.'" *Touchstone v. Touchstone*, 682 So. 2d 374, 378-79 (Miss. 1996) (quoting *Tucker v. Tucker*, 453 So. 2d 1294, 1297 (Miss. 1984)).

¶38. The chancellor received evidence of the boys' early post-divorce problems via the testimony of the day-care director who first expelled them. Also, the chancellor heard the testimony of Dr. Wheat and the GAL. The chancellor considered the totality of circumstances affecting the boys over the entire period since the divorce. He referred specifically to the three expulsions from day care, the kindergarten failures, and the behavior problems continuing up until the time of the hearing. He found that Jennifer was "overwhelmed" and "in denial." He heard Jennifer deny seven instances of misbehavior that were documented in the boys' school records from 2006-07. The chancellor found that it was Jennifer's "failure to accept and acknowledge the reality of this situation and begin to deal with it immediately that has caused what was once a small problem to exacerbate and to worsen over a period of time to reach what probably was a crescendo in – at the end of 2006."

¶39. Jennifer argues that *Polk v. Polk*, 559 So. 2d 1048 (Miss. 1990), supports her position. In *Polk*, this Court affirmed the holding of a chancellor who had found no material change of circumstances. *Id.* at 1050. The mother in *Polk* claimed that a material change of circumstances had affected her child's education, but a school principal testified that the

child was doing well in school and had no behavioral problems. *Id.* Here, the reports of some recent improvements had to be weighed with evidence to the contrary, including that one boy already had failed kindergarten and the other was in danger of doing the same.

¶40.   Jennifer argues that the chancellor erred by not making specific findings regarding each boy individually, and asks this Court to consider *Brocato v. Brocato*, 731 So. 2d 1138 (Miss. 1999); and *Brawley v. Brawley*, 734 So. 2d 237 (Miss. Ct. App. 1999).  In each of these cases, a chancellor granted custody of one child to the mother and one child to the father. *See Brocato*, 731 So. 2d at 1140;  *Brawley*, 734 So. 2d at 239.  In *Brocato*, this Court affirmed the custody order, as the chancellor had considered all the factors and had made corresponding findings of fact regarding each child.  However, the Court remanded for additional findings regarding visitation. *Brocato*, 731 So. 2d at 1144.  In *Brawley*, the Court of Appeals affirmed the custody order, finding that the chancellor had considered the preference of one of the children to remain with his mother.  *Brawley*, 734 So. 2d at 242. These cases show that additional findings may be necessary when a chancellor orders different custody arrangements for siblings.  However, the cases do not support Jennifer's argument.  Here, the chancellor noted that Blake's problems were more severe, but primarily considered the boys' interests at the same time.  The chancellor clearly considered specific facts and conduct peculiar to each child, and applied the proper legal analysis for each to determine each boy's best interest.

¶41.   We hold that the chancellor's finding that a material change of circumstances had adversely affected both boys was not manifestly wrong and that it was supported by substantial evidence.

### III. Whether the chancellor improperly weighed and applied the *Albright* factors.

¶42. The chancellor made on-the-record findings of the *Albright* factors, as well as other factors relevant to the case, in determining that the best interest of the children – the polestar factor – favored transfer of custody of the boys to Steve. *See Albright*, 437 So. 2d at 1005. This Court grants deference to factual findings in custody decisions, as chancellors have "the ultimate discretion to weigh evidence the way [they see] fit. 'The credibility of the witnesses and the weight of their testimony, as well as the interpretation of evidence . . . are primarily for the chancellor as the trier of facts.'" *Johnson v. Gray*, 859 So. 2d 1006, 1013-14 (Miss. 2003) (quoting *Chamblee v. Chamblee*, 637 So. 2d 850, 860 (Miss. 1994)).

¶43. Jennifer submits that the chancellor improperly weighed four of the factors: (1) health of the children; (2) home, school, and community record of the children; (3) moral fitness of the parents; and (4) parenting skills. Regarding the health of the children, and their home, school, and community records, Jennifer argues that the chancellor repeated the same error as in the material-change-of-circumstances analysis, that is, that the chancellor failed to consider evidence of recent improvements. The record reveals that the chancellor did consider the reports of improvement, but was convinced by evidence to the contrary. Thus, the chancellor did not ignore this evidence, but rather weighed it differently than Jennifer would like, which is within his prerogative.

¶44. Regarding the moral fitness of the parents, Jennifer argues that the factor favors her more than just slightly, as Steve is a convicted felon. However, the chancellor took note of the fact that Steve's offense had occurred before he married and that nine years had passed,

during which he had not continued "into any further involvement in the drug world . . . ." The chancellor mentioned in the *Albright* analysis that Steve had matured, as evidenced by his marriage and his successful pursuit of a college degree. *See Giannaris*, 960 So. 2d at 469; *Riley v. Doerner*, 677 So. 2d 740, 742 (Miss. 1996).

¶45.    Regarding parenting skills, the chancellor was persuaded by the GAL's report on her visits to both homes, but that was not the extent of the evidence. The GAL presented a thirty-four-page report, including the results of her interviews with nineteen witnesses and her analysis of the entire record, including the exhibits. The chancellor also heard testimony from and received a written report from Dr. Wheat, who had counseled Steve and Jennifer on parenting skills.

¶46.    Jennifer argues that the evidence was insufficient to support a finding that Steve's parenting skills were superior, considering the fact that she had taken care of the boys while Steve was delinquent in providing for their support. The record contains facts beyond those discussed *supra* (Facts and Procedural History), which support the chancellor's finding that the parenting-skills factor favored Steve. Also, the chancellor considered Steve's marriage as a favorable factor, stating:

> [Steve] will be assisted by his current wife, Danna, and the Court was very impressed by her and her willingness to help the children, her maturity as well. . . . Both Steve . . . and [Danna] . . . just observing both of them on the stand, their demeanor, their very direct way of answering questions, they exhibit a lot of confidence, a lot of assurance that I think leads to good parenting.

As substantial evidence supports the chancellor's finding that it is in the best interests of the boys to be in the custody of Steve, we find no error.

25

**IV. Whether the guardian ad litem acted beyond her authority by offering hearsay testimony without being qualified as an expert.**

¶47. Jennifer argues that the GAL exceeded the proper role of a GAL by offering hearsay testimony, as well as taking "on a role as a litigant/expert" by providing a written report to the court, making recommendations, discussing the views of the court-appointed counselor, filing a motion, testifying, examining witnesses, and meeting ex-parte with the chancellor.

¶48. Other than offering hearsay testimony as discussed below, the GAL was simply following the provisions of the GAL statute and the pronouncements of this Court. This Court dealt recently with a similar issue in *S.G. v. D.C.*, 13 So. 3d 269 (Miss. 2009), an opinion handed down after the briefs were filed in this appeal. The *S.G.* Court stated the following regarding the proper role of a GAL:

> [A] guardian ad litem appointed to investigate and report to the court is obligated to investigate the allegations before the court, process the information found, report all material information to the court, and (if requested) make a recommendation. However, the guardian ad litem should make recommendations only after providing the court with all material information which weighs on the issue to be decided by the court, including information which does not support the recommendation. The court must be provided all material information the guardian ad litem reviewed in order to make the recommendation. Recommendations of a guardian ad litem must never substitute for the duty of a chancellor.

*Id.* at 282. The GAL in the case *sub judice* did not offer the type of testimony criticized in *S.G. See id.* at 274 n.5. This GAL reported on matters required by her appointment, and consistent with a GAL's duties as outlined in *S.G. Id.* at 282.

¶49. The statute's provision that a GAL "shall have the duty to protect the interest of a child for whom he [or she] has been appointed guardian ad litem. The guardian ad litem shall

26

investigate, make recommendations to the court or enter reports as necessary to hold paramount the child's best interest," is consistent with the traditional roles required of a GAL, which predate the enactment of the statutes. Miss. Code Ann. § 43-21-121(3) (Rev. 2009). In *In the Interest of D.K.L.*, 652 So. 2d 184 (Miss. 1995), this Court held that a GAL had failed in his duties by simply deferring to a therapist's recommendations, and not submitting his own recommendation as to the best interests of a child. *Id.* at 188. The *D.K.L.* Court stated that the GAL "did not have an option to perform or not perform, rather he had an affirmative duty to zealously represent the child's best interest." *Id.* In *In the Interest of R.D.*, 658 So. 2d 1378 (Miss. 1995), this Court held that "children are best served by the presence of a vigorous advocate free to investigate, consult with [the children] at length, marshal evidence, and to subpoena and cross-examine witnesses." *Id.* at 1383 (quoting *Shainwald v. Shainwald*, 395 S.E.2d 441, 444 (S.C. Ct. App. 1990)). *See also M.J.S.H.S. v. Yalobusha County Dep't of Human Servs. ex rel. McDaniel*, 782 So. 2d 737, 740-42 (Miss. 2001) (GAL failed in his duty by relying on DHS records and the recommendations of a therapist and social worker). In *D.J.L. v. Bolivar County Department of Human Services ex rel. McDaniel*, 824 So. 2d 617 (Miss. 2002), this Court found no error in a GAL's cross-examination of witnesses. *Id.* at 622. The Court also "emphatically proclaim[ed] to the bench and bar that . . . the guardian must submit a written report to the court during the hearing, or testify and thereby become available for cross-examination by the natural parent." *Id.* at 623. Therefore, the GAL would have been derelict in her duty to zealously represent the boys' best interests if she had failed to interview the boys, consider

the opinions of experts, marshal evidence, make an independent recommendation, question witnesses, submit reports, and make herself available for cross-examination.

¶50. The chancellor did not allow the GAL to usurp his role as the "ultimate finder of fact." *Id.* The chancellor heard all witnesses, read all the reports, and made his own decision based upon independent findings of fact. Thus, we find this portion of Jennifer's argument to be without merit.

¶51. This leaves us with the issue of hearsay testimony.[7] Jennifer cites ***Whitehurst v. State***, 540 So. 2d 1319 (Miss. 1989), for the proposition that, where a conflict exists between a statute and the Mississippi Rules of Evidence, the rules predominate and the statute is thus repealed. In ***Whitehurst***, this Court dealt with what effect the relatively new evidentiary rules would have on preexisting, conflicting statutes. *Id.* at 1322-23. The ***Whitehurst*** Court held that Mississippi Rule of Evidence 501 listed all available privileges (except those "otherwise provided by the U. S. Constitution, State Constitution, by these rules, or by other applicable rules . . . ."). *Id*. at 1324; M.R.E. 501. Thus, a prior statute granting an additional privilege was repealed. ***Whitehurst***, 540 So. 2d at 1324. Jennifer argues that ***Whitehurst*** requires this Court to hold that the hearsay and expert-testimony rules require the repeal of the statute delineating the duties of a GAL. *See* Miss. Code Section § 43-21-121 (Rev.

---

[7]Hearsay testimony should not to be confused with a GAL's written reports, which sometimes, by their very nature, will include statements, which, if offered into evidence at trial to prove the truth of the matter asserted, would be inadmissible hearsay, unless they qualify under one of the exceptions to the rule against hearsay. Any such inadmissible hearsay, however, would not require exclusion of the entire report. This issue is not before the Court this day.

2009); M.R.E. 702, 801, 802. Jennifer's argument conflates evidentiary rules with a statute dealing with duty. Thus, reliance on **Whitehurst** is misplaced.

¶52. In the case *sub judice*, the GAL was appointed by orders of the chancellor without reference to the statute, a practice which preceded the enactment of the statutes. Hearsay and expert witness-evidentiary rulings are not controlled by statutes, but rather the rules of evidence.

¶53. In case two, the GAL presented an oral report at an emergency hearing. Jennifer objected, stating that if the teachers and others being quoted by the GAL had something to report, they should have been required to be there. The court responded that GALs are allowed by "historical practice" to offer hearsay testimony, and overruled the objection. We find that it was error for the chancellor to find that the rules of evidence did not apply in this adversarial proceeding.[8] However, after the court offered a full trial on the issues, Jennifer agreed to entry of the modification order, thus mooting an appeal of that issue in case two.

¶54. In case three, the GAL presented only an oral report. Jennifer objected on grounds other than hearsay. The chancellor overruled the objection, addressing Jennifer's concerns, i.e., that the GAL was unable to complete a written report, given the lack of cooperation from the Madison County personnel. During the GAL's oral report, which included hearsay, Jennifer did not object to those portions of the testimony that might have been subject to

---

[8] *See* **Scaringe v. Herrick**, 711 So. 2d 204, 204-05 (Fla. Dist. Ct. App. 1998). ("Hearsay rules contained in the Florida [rules of evidence] apply to [Florida's GAL statute]"). Although the Massachusetts case cited in the dissent held that GAL reports may properly contain hearsay information, that court does not address the hearsay issue in an adversarial proceeding, thus, limiting the application of its holding. *See* **Pizzino v. Miller,** 858 N.E.2d 1112, 1121 (Mass. App. Ct. 2006).

hearsay rulings.[9] As there was no contemporaneous objection to testimony based on hearsay, the trial court was not afforded an opportunity to rule on specific testimony on the hearsay evidence issue. "The well-recognized rule is that a trial court will not be put in error on appeal for a matter not presented to it for decision." *Mills v. Nichols*, 467 So. 2d 924, 931 (Miss. 1985). Thus, this issue is without merit.

**V.      Whether the Chancery Court of Rankin County properly exercised jurisdiction over the allegations of abuse raised in 2008.**

¶55.    Jennifer argues that the chancellor erred by asserting jurisdiction. The applicable statute follows:

> The Youth Court shall have exclusive original jurisdiction in all proceedings concerning . . . an abused child . . . except in the following circumstances: . . .
> (c) When a charge of abuse of a child first arises in the course of a custody action between the parents of the child already pending in the chancery court and no notice of such abuse was provided prior to such chancery proceedings, the chancery court may proceed with the investigation, hearing and determination of such abuse charge as a part of its hearing and determination of the custody issue as between the parents, notwithstanding the other provisions of the Youth Court Law.

Miss. Code Ann. § 43-21-151(1) (Rev. 2009). Jennifer argues that the statutory exception is inapplicable, as no custody action was pending in chancery court at the time of the abuse allegation. She claims that the custody matter already had been adjudicated and that the subsequent litigation, including the matters already on appeal to this Court (modifications of custody and visitation), and the matters pending before the chancery court (motions for contempt) were "non-custodial." However, this Court has held that contempt matters are

---

[9]She objected once, offering "speculation" as the basis of the objection.

"ancillary to the original action," giving the original court "continuing jurisdiction over the subject matter . . . ." *Tollison v. Tollison*, 841 So. 2d 1062, 1064-65 (Miss. 2003).

¶56.    Our statute allows a chancery court that issued a divorce decree to retain jurisdiction over the subject matter and the parties, and, on petition, to change the decree.  *See* Miss. Code Ann. § 93-5-23 (Rev. 2004).  That same statute continues,  "The [chancery] court may investigate, hear and make a determination in a custody action when a charge of abuse . . . arises in the course of a custody action as provided in Section 43-21-151 . . . ."  *Id.*  In *Morris v. Morris*, 245 So. 2d 22 (Miss. 1971), this Court held that a chancery court that had granted a divorce and awarded custody retained jurisdiction to hear a modification motion, despite a youth court's attempt in the interim "to deal with an emergency temporary situation." *Id.* at 24.  This Court held that "[j]urisdiction had already vested in the Chancery Court three months before" the youth court became involved. *Id.*

¶57.    In a case in which a father attempted to modify a chancery court custody order in the youth court of another county, this Court stated the following rule:

> [J]uvenile jurisdiction acquired by a court in divorce proceedings over the subject of the custody and maintenance of the child or children of the parties to the divorce suit is not only continuing, but is also exclusive and precludes any other court in the same state . . . from thereafter acquiring or exercising jurisdiction over the same subject.  All proceedings related to the maintenance and custody of such child or children of the divorced parents must thereafter be brought in the same court as that in which the original decree affecting that subject was rendered.

*Ladner v. Ladner*, 206 So. 2d 620, 624-25 (Miss. 1968) (*abrogated on another issue by Bubac v. Boston*, 600 So. 2d 951 (Miss. 1992)).  *See also* *Helmert v. Biffany*, 842 So. 2d 1287 (Miss. 2003).

¶58. In ***K.M.K. v. S.L.M. ex rel. J.H.***, 775 So. 2d 115 (Miss. 2000) (five-four decision), this Court limited the jurisdiction of chancery courts, but only "*if* there has been a prior proceeding in the youth court concerning that same child." ***Id.*** at 118 (emphasis in original). In ***K.M.K***, a youth court placed a child in a foster home. ***Id.*** at 116. The foster parents, after unsuccessful attempts in youth court to terminate the natural mother's visitation, filed a petition in chancery court to terminate the parental rights of both the natural mother and the putative father. ***Id.*** at 116, 118. This Court held that the youth court had priority jurisdiction, as it already had considered the issues of neglect and abuse of the children. ***Id.*** at 118. Additionally, the Court explained that its holding would promote judicial economy by preventing conflicting orders in multiple courts. ***Id.*** Here, however, the first court to issue an order was the chancery court. *See also* ***E.J.M. v. A.J.M.***, 846 So. 2d 289, 292-93 (Miss. Ct. App. 2003) (where no prior youth court order exists, a chancery court may proceed with a custody action based on child abuse).

¶59. In ***Tollison***, a chancery court granted a mother custody of her child. ***Tollison***, 841 So. 2d at 1064. After the mother moved to another county, she filed a petition in that county to terminate the father's parental rights. ***Id.*** at 1063-64. This Court held that "a chancery court which grants the custody of children in a divorce proceeding has, as between the same parties, continuing exclusive jurisdiction" and that that jurisdiction takes precedence over a statute that allows filing in the child's county of residence. ***Id.*** at 1066. Thus, here, it was immaterial to the chancery court's continuing jurisdiction that Steve and the boys had moved to Madison County.

¶60.   In her argument, Jennifer cites two cases, both of which are distinguishable.  *See In the Interest of D.L.D.*, 606 So. 2d 1125 (Miss. 1992); *Thomas v. Byars*, 947 So. 2d 375 (Miss. Ct. App. 2007).  In *D.L.D.*, this Court dealt with an unlikely situation in which a jurisdictional conflict arose in Wilkinson County, which does not have a county court. *D.L.D.*, 606 So. 2d at 1128.  The problem arose when the chancellor recused himself and assigned the divorce and the child-abuse proceedings in the same domestic case to two different judges.  *Id.*  The two proceedings were conducted contemporaneously, and the orders issued were in conflict.  *Id.* at 1126-27.  Here, however, the chancery court orders and the youth court order were not contemporaneous, as the jurisdiction of the chancery court had vested long before the youth-court proceeding.  *Thomas* is likewise distinguishable, in that the Court of Appeals held that a youth court's custody order took precedence over a chancellor's conflicting order issued five years later.  *Thomas*, 947 So. 2d at 378-79.  Thus, a chancery court is not to function as an appeals court for prior youth-court decisions.

¶61.   For the reasons detailed *supra*, we find no error by the chancellor in determining that the chancery court *could* assert original jurisdiction over the abuse allegation, as the chancery court had continuing jurisdiction; for the jurisdictional statute quoted above grants jurisdiction to a youth court in allegations of child abuse, but excepts that a chancery court "may proceed" if a custody action is pending.  *See* Miss. Code Ann. § 43-21-151(1) (Rev. 2009).  Thus, the chancery court had jurisdiction to proceed.  Based on a child-abuse allegation in Madison County, a youth court could proceed on an emergency basis and issue an order for temporary custody, but not for a period in excess of forty-eight hours.  *See* Miss. Code Ann. § 43-21-301(3) (Rev. 2009).  A shelter hearing is required if the temporary

custody is to extend beyond forty-eight hours. *See* Miss. Code Ann. § 43-21-309(1)(b) (Rev. 2009). Such a hearing was scheduled, but never held, as Steve objected to youth-court jurisdiction before the merits of the matter were considered. No ruling was ever issued on the jurisdictional dispute, nor was a shelter hearing ever completed in Madison County. Thus, the chancellor never passed on the validity of an order of another court, but rather acted on the chancery court's continuing jurisdiction over the matter.

¶62. We find that the chancellor was not in error to exercise jurisdiction, as (1) the chancery court possessed original jurisdiction, and (2) the Madison County Youth Court failed to comply with the statutory process.

## CONCLUSION

¶63. We affirm the judgments of the Chancery Court of Rankin County. The judgments on the legal questions are not in error, and substantial evidence exists to support the findings of fact.

¶64. **AFFIRMED.**

**CARLSON, P.J., DICKINSON, LAMAR, KITCHENS, AND CHANDLER, JJ., CONCUR. DICKINSON, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY CARLSON, P.J., RANDOLPH, LAMAR, AND CHANDLER, JJ. PIERCE, J., CONCURS IN PART AND IN RESULT WITH SEPARATE WRITTEN OPINION JOINED BY WALLER, C.J., AND GRAVES, P.J., JOINS IN PART.**

**DICKINSON, JUSTICE, SPECIALLY CONCURRING:**

¶65. For several reasons, I disagree with the view – expressed in the separate opinion that concurs in part and in result ("CIPR") with the majority – that guardians ad litem should be allowed to introduce hearsay before chancellors to be used substantively at a trial on the

34

merits. Rule 1 of the Mississippi Rules of Evidence plainly says those rules apply in chancery court – and they include no exception for guardians ad litem.

¶66. Since this is not a youth-court case, most of the authority cited in the CIPR opinion does not apply. And the portion that does apply provides no Mississippi authority for the proposition that, in adjudicating a case on the merits, a chancellors may ignore or "relax" the rules of evidence.

¶67. But even if such authority existed here (as it apparently does in Massachusetts), we should quickly overrule it. Chancellors should not decide the fate of children based on pure, rank, un-cross-examined hearsay.

¶68. Certainly I agree that guardians ad litem – properly appointed under Rule 706[10] and qualified as experts under Rule 702[11] – may rely on hearsay[12] in reaching their opinions. But hearsay used to support an expert's opinion is quite different from hearsay admitted as substantive evidence.

¶69. Finally, in my experience, it is indeed a rare and unreliable piece of hearsay evidence that cannot be made to qualify under any of the thirty-one exceptions[13] to the rule against hearsay.[14] And if we believe enforcement of the rule against hearsay is appropriate and

---

[10]Miss. R. Evid. 706.

[11]Miss. R. Evid. 702.

[12]*See* Miss. R. Evid. 703 (expert may rely on facts and data reasonably relied upon by experts in field, and such facts and data need not be admissible into evidence).

[13]*See* Miss. R. Evid. 803-804.

[14]*See* Miss R. Evid. 802 ("Hearsay is not admissible except as provided by law.")

necessary to protect the rights of murderers, rapists, and pedophiles, surely we think it necessary to protect the rights and interests of children and their parents.

**CARLSON, P.J., RANDOLPH, LAMAR AND CHANDLER, JJ., JOIN THIS OPINION.**

**PIERCE, JUSTICE, CONCURRING IN PART AND IN RESULT:**

¶70.     I write separately today to express my disagreement with the majority's finding that the chancellor erred in allowing the guardian ad litem to offer hearsay testimony because such testimony is barred by the Rules of Evidence. (*See* Maj. Op. ¶ 53).  Guardians ad litem are sometimes appointed in child-custody cases pursuant to  Mississippi Code Sections 43-21-121 and 93-11-65.  Section 43-21-121 states, "[t]he guardian ad litem shall investigate, make recommendations to the court or enter reports as necessary to hold paramount the child's best interest."  Miss. Code Ann. § 43-21-121(3) (Rev. 2009).  Further, guardians ad litem required to be appointed under Section 93-11-65 are appointed pursuant to the procedure set forth in Section 43-21-121.  Miss Code Ann. 93-11-65(4) (Rev. 2004).[15]

¶71.     Guardians ad litem are not appointed pursuant to these two statutes only when there are allegations of child abuse, but appointments also are made in numerous other

---

[15]This Court has pointed out that "[t]radionally rules of evidence have been relaxed in youth court proceedings." Miss. Code Ann § 43-21-121 (Rev. 2004).  ***In Interest of T.L.C.***, 566 So. 2d 691, 700 (Miss. 1990). Section 43-21-121 sets out the procedure for appointing a guardian ad litem in youth court proceedings. Section 93-11-65 directs the appointment of a guardian ad litem in matters where charges of abuse or neglect have been made and requires "proceedings in chancery court on the abuse or neglect charge shall be confidential in the same manner as provided in youth court proceedings." Miss. Code Ann. § 93-11-65(4) (Rev. 2004).  Therefore, when guardians ad litem are appointed pursuant to either of these two statutes, the rules of evidence may be relaxed.

circumstances – such as contested child-custody actions. We recently have emphasized that "[t]he role to be played by a guardian ad litem is complex and not subject to a simple, universal definition." **S.G. v. D.C.**, 13 So. 3d 269, 280 (Miss. 2009). We further said, "Some circumstances require that a guardian ad litem serve as an arm of the court, appointed to investigate and present to the court *all* necessary and material information which might affect the court's decision." **Id.** (citing **S.N.C. v. J.R.D.**, 755 So. 2d 1077, 1082 (Miss. 2000)) (emphasis added). The reports of the guardian ad litem should be filed in advance of trial in order to allow the parties to review them, subpoena witnesses, and be prepared to present their cases at trial. In order to present "*all* necessary and material information" which may be relevant to the trial court's decision, it may at times be necessary for the guardians ad litem to present hearsay evidence.

¶72. The Massachusetts courts have held as such. Their rule has been succinctly summed up by the Appeals Court of Massachusetts, which said:

> In reporting on specified topics, the guardian ad litem acts as an arm of the court and is an integral part of the judicial process. *Guardian ad litem reports may properly contain hearsay information*. All that is required is that the guardian ad litem be available to testify at trial and that the source of the material be sufficiently identified so that the affected party has an opportunity to rebut any adverse or erroneous material contained therein. The guardian ad litem is free to make recommendations, provided the judge draws his own conclusions and understands that the responsibility of deciding the case is his and not that of the guardian.

**Pizzino v. Miller,** 67 Mass. App. Ct. 865, 875-876; 858 N.E.2d 1112 (Mass. App. Ct. 2006) (internal citations omitted) (emphasis added).[16]

---

[16]  *See also* **Adoption of Georgia**, 433 Mass. 62, 739 N.E.2d 694, 699-700 (Mass. 2000); **Gilmore v. Gilmore**, 369 Mass. 598, 604-605, 341 N.E.2d 655 (1976); **Jones v.**

¶73.   I agree with the reasoning and procedure as outlined by the Appeals Court of Massachusetts.  No Mississippi case setting out a similar procedure exists.  However, the majority, if not all, of the chancellors in Mississippi follow this procedure – and are correct in doing so.  Therefore, I can only concur with the majority in part and in result.

¶74.   Furthermore, with all due respect to my learned and more experienced colleague, I must point out some practical and very serious concerns with the analysis contained in the specially concurring opinion.  Often, chancellors are forced to remove children from dangerous or unhealthy environments and must enlist the assistance of a guardian ad litem in doing so.  In such cases, guardians ad litem are required to act swiftly to protect the best interests of children – and to fulfill that obligation, they must sometimes provide emergency testimony which contains hearsay.

¶75.   Guardians ad litem are appointed to serve the best interests of children. Using the analysis found in the specially concurring opinion, critical testimony would be inadmissible, and children might be left in dangerous situations – all for the sake of strict adherence to our Rules of Evidence.  Lest this Court forget, our chancellors understand the difference between hearsay and nonhearsay testimony and are capable of assigning the appropriate weight to the testimony provided by the guardian ad litem accordingly.

¶76.   It is my opinion that a guardian ad litem – when appointed as an attorney as in the present matter – is an arm of the court.  In order for the guardians ad litem to assist the court in determining the best interests of children, they must fulfill their duty to interview all concerned and must also be able to testify as to the full extent of their findings.  To hold

*Jones,* 349 Mass. 259, 264, 207 N.E.2d 922 (1965).

otherwise would impede the chancellor's ability to determine what is in the best interests of children. "Let us remember, it is the responsibility of this Court, like the chancellor, to make the best interest of the child our 'polestar' consideration." *Robinson v. Lanford*, 841 So. 2d 1119, 1122 (Miss. 2003) (citing *Hensarling v. Hensarling*, 824 So.2 d 583, 587 (Miss. 2002)).

¶77.    The majority's view, and that of the specially concurring opinion, while noble, in many cases will have the opposite effect of the stated purpose. However sincere in their belief that applying a strict application of the Mississippi Rules of Evidence protects children, my experience as a chancellor dealing with some of the most delicate child custody matters compels me to take the opposite view. There can be no cookie-cutter approach to protecting children. As a member of the Supreme Court Rules Committee on Civil Practice and Procedure, I recommend we adopt a rule specifically for guardians ad litem with guidance from chancellors, practitioners, guardians ad litem and other interested parties. The best interests of children demand it.

**WALLER, C.J., JOINS THIS OPINION. GRAVES, P.J., JOINS THIS OPINION IN PART.**