# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-CA-00962-COA

**AMANDA PELLEGRIN**                                                                 **APPELLANT**

**v.**

**KIRK JOHN PELLEGRIN**                                                                 **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 05/22/2015 |
| TRIAL JUDGE: | HON. D. NEIL HARRIS SR. |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | ELLIOT G. MESTAYER |
| ATTORNEY FOR APPELLEE: | CALVIN D. TAYLOR |
| NATURE OF THE CASE: | CIVIL - CUSTODY |
| TRIAL COURT DISPOSITION: | PHYSICAL CUSTODY OF THE MINOR CHILDREN AWARDED TO APPELLEE |
| DISPOSITION: | REVERSED AND REMANDED - 08/01/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE IRVING, P.J., FAIR AND WILSON, JJ.**

**IRVING, P.J., FOR THE COURT:**

¶1.    The Chancery Court of Jackson County granted Kirk Pellegrin and Amanda Pellegrin a divorce and ultimately awarded physical custody of the parties' minor children to Kirk. Amanda appeals, arguing that the chancery court erred in two respects: in its decision awarding physical custody of the parties' minor children to Kirk and in its failure to hold Kirk in civil contempt for his failure to comply with certain interim temporary orders of the court.

¶2.    Finding error, we reverse and remand.

### FACTS AND PROCEDURAL HISTORY

¶3.     Kirk and Amanda were married on September 11, 2004. They had two children, Kayden and Kenadie, before they separated in September 2009. The following month, Kirk filed a complaint for divorce, alleging that he was entitled to a divorce from Amanda on the statutory ground of habitual cruel and inhuman treatment or, alternatively, on the ground of irreconcilable differences.

¶4.     Approximately two months after Kirk filed for divorce, the chancery court entered a temporary order granting the parties joint custody, "with physical custody being vested [in] Amanda." This temporary order was set to be reviewed in January 2010. However, it apparently was not reviewed until March 24, 2010, because on that date, the chancellor entered an amended temporary order awarding joint custody to Kirk and Amanda, "with physical custody being vested with [Amanda]." On April 8, 2010, the chancellor entered a third temporary order, again granting joint custody of the children to Kirk and Amanda, with "physical custody being vested with Amanda." On May 27, 2010, the chancellor again entered a temporary order addressing custody, but this time the order was entitled "Agreed Temporary Visitation Order" and addressed custody, as well as visitation, although custody remained unchanged. On July 6, 2010, the chancellor yet again entered an order awarding joint custody of the minor children to Kirk and Amanda, "with physical custody being vested with [Amanda]."

¶5.     On January 27, 2011, Kirk filed an amended complaint for an emergency hearing in which he alleged that Amanda had become pregnant with another man's child. He also

2

alleged that Amanda had been admitted to the hospital because of her multiple sclerosis and, instead of contacting him, had "allowed her brother to watch the children." Kirk sought an order relieving him of the responsibility of paying Amanda's medical expenses associated with, and stemming from, the soon-to-be birth of Amanda's child that was fathered by another man. He also sought a change of custody of the minor children based on Amanda's alleged incapacity to care for the children because of her illness with multiple sclerosis.

¶6. On February 10, 2011, Kirk filed an amended complaint for divorce in which he sought, among other things, custody of the minor children and a divorce on the grounds of habitual cruel and inhuman treatment and adultery or, in the alternative, on the ground of irreconcilable differences. On December 20, 2011, Amanda filed a counterclaim for divorce on the ground of habitual cruel and inhuman treatment or, in the alternative, on the ground of irreconcilable differences. She requested that she be granted custody of the parties' minor children. On January 31, 2012, Kirk filed a complaint for modification in which he again asked for custody of the parties' minor children. He alleged that Amanda continued to have multiple health problems and could not take care of herself or the minor children. Amanda responded that she lived with her mother, that her mother assisted her as needed, and that the children did not "have to be moved from place to place, further disrupting their lives."

¶7. On February 9, 2012, Amanda filed a motion for contempt, alleging that Kirk had not paid certain medical expenses of the minor children as had been ordered in several of the interim temporary orders. On the following day, the chancellor granted Kirk a divorce on

3

the ground of adultery, based on the fact that Amanda had given birth to a child fathered by another man. However, the court did not decide the issue of custody of the minor children. More than a year later, Kirk filed a motion for modification, contempt, and change of custody. In his complaint, Kirk alleged that a material change in circumstances had occurred in that Amanda was not stable, had willfully violated all court orders and had continued to alienate the children from him.

¶8. On November 22, 2013, pursuant to motion filed by Kirk, the court appointed a guardian ad litem to, among other things, "investigate, make recommendations to the Court and enter reports, and act in all respects to protect the best interests of the minor children."[1] On January 22, 2014, the guardian ad litem made her initial report in which she made the following recommendation:

> As the guardian ad litem, it is apparent to me through my investigation and research that both parents would provide a loving, nurturing home to the children. Both parents expressed a willingness and desire to have primary custody of the children. The recommendation of the guardian ad litem is that the best interest of the children would be best served by awarding joint physical and legal custody to Kirk Pellegrin and Amanda Pellegrin.

On August 14, 2014, in an updated report, the guardian ad litem stated:

> This was a particularly difficult case to decide as both parents have expressed a strong willingness and desire to have custody of the children. The recommendation of the guardian ad litem is the best interests of the children would be best served by awarding joint legal custody, physical custody to Kirk Pellegrin, and extensive visitation to Amanda Pellegrin.

---

[1] The guardian ad litem had been practicing law only one and a half years.

¶9. On January 5, 2015, without elaborating or otherwise explaining his decision, the chancellor entered an order, finding "that the parties are hereby vested with joint legal custody of the minor children and Kirk John Pellegrin is hereby vested [with] physical custody of the minor children." Amanda timely filed a motion for reconsideration. In her motion, she asserted:

> The movant would show that the decision was against the weight of the evidence on the issue of custody since the movant has had continuity of care, available, available full time, her health has improved, and is an active participant in the care of the minors. Further, the guardian ad litem did not complete her investigation as to why the children are so afraid of their father.

In the prayer of her motion, Amanda requested that "findings of fact and conclusions of law be prepared concerning custody" and an investigation be made into why the children feared their father.

¶10. On March 3, 2015, the chancellor entered a order modifying the January 5, 2015 judgment pursuant to Amanda's motion for reconsideration or relief from judgment. In paragraph IV of the order, the chancellor stated, "The [c]ourt agreed that it will provide a [f]indings of [f]act and [c]onclusions of [l]aw[,] preserving his ruling on the issue of modifying custody by applying the custody provisions." However, the record does not reflect that the chancellor ever entered findings of fact and conclusions of law.

¶11. As appropriate, additional facts will be related during the discussion.

DISCUSSION

I. *Child Custody*

¶12.    The standard of review for child-custody cases was succinctly addressed by this Court

in *Funderburk v. Funderburk* as follows:

> We may not always agree with a chancellor's decision as to whether the best
> interests of a child have been met, especially when we must review that
> decision by reading volumes of documents rather than through personal
> interaction with the parties before us.  However, in custody cases, we are
> bound by the limits of our standard of review and may reverse only when the
> decision of the trial court was manifestly wrong, clearly erroneous, or an
> erroneous legal standard was employed.

*Funderburk v. Funderburk*, 909 So. 2d 1241, 1243 (¶¶4-5) (Miss. Ct. App. 2005).

¶13.    The *Albright*[2] factors are the framework the chancellor uses to make a determination

regarding child custody.  "While the *Albright* factors are extremely helpful in navigating

what is usually a labyrinth of interests and emotions, they are certainly not the equivalent of

a mathematical formula. Determining custody of a child is not an exact science." *Lee v. Lee*,

798 So. 2d 1284, 1288 (¶15) (Miss. 2001).  It is necessary that we briefly revisit the

chancellor's analysis of each *Albright* factor to see if he committed manifest error.  "[T]he

chancellor has the ultimate discretion to weigh the evidence the way he sees fit.  The

credibility of the witnesses and the weight of their testimony, as well as the interpretation of

evidence, . . . are primarily for the chancellor as the trier of facts."  *Johnson v. Gray*, 859 So.

2d 1006, 1013-14 (¶36) (Miss. 2003).

¶14.    As noted, the chancellor did not discuss the *Albright* factors in his judgment.  But

---

[2] In *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983), the Mississippi Supreme
Court established a ten-factor test to assist Mississippi's chancery courts in making child-
custody determinations.

6

perhaps more importantly, he did not even mention the guardian ad litem's report or recommendation. The chancellor simply found that Kirk was "vested" with physical custody. So the only discussion of the *Albright* factors was done by the guardian ad litem, who had been practicing law only one and one-half years. Although the guardian ad litem discussed each of the *Albright* factors, she did not determine which party was favored by three of the factors.

¶15. As might be expected, the parties differ as to whether the guardian ad litem was correct in her analysis of each of the those factors.[3] Below, we set forth the guardian ad litem's determination as to each factor, and briefly address the parties' argument regarding each factor.

### A. Age, Health, and Sex of the Children

¶16. The guardian ad litem did not specify the party that this factor favored. Amanda argues that the young age of the children obviously favors the mother; but the sex of the children is neutral since one child is a boy and the other is a girl. With respect to health, she argues that this factor favors the mother because of the children's attention deficit hyperactivity disorder (ADHD) problems and mental-health issues. She alleges that Kirk does not believe the children suffer from ADHD issues despite the fact that the children have been diagnosed with ADHD and are doing well while taking the medication. She notes that,

---

[3] Amanda's overarching argument is that the chancellor was manifestly in error in making certain findings which were not supported by substantial evidence, as well as failing to make findings which were supported by the evidence.

7

in response to a question about the children taking ADHD medication, he testified: "I don't see any reason that they should be on it." Amanda also asserts that she is a certified emergency medical technician and is better qualified to take care of the children's health-care needs. She further asserts that the guardian ad litem failed to realize the importance of her training.

¶17. Kirk responds that while both children have been diagnosed with ADHD, no testimony was presented to show that Amanda's training would render her a better caregiver. Also, because the children were seven and eight years old at the time of trial, he argues that the tender-years doctrine does not apply. Finally, because one child is male and one child is female, this factor would be neutral.

### B. Continuity of Care Prior to Separation

¶18. The guardian ad litem did not specify the party that this factor favored. Amanda notes that she quit her job at the beginning of the marriage when she became pregnant with the couple's youngest child. She further contends that based on Kirk's schedule, he basically only saw the children on days he did not have to work, while she took care of the children five days a week. In addition, she argues that between the initiation of the divorce in 2009 and the final custody determination in 2015, she was the children's primary caregiver.

¶19. Kirk responds that with his unorthodox work schedule, his time and care with the two children fluctuated depending on his schedule. However, he testified that despite his work schedule, he still spent a considerable amount of time with the children and was the primary

caregiver. Kirk argues that, during the marriage, Amanda often opted to stay in bed due to medical reasons, causing her to be too sick to cook, to provide transportation to and from school for the children, and to wash clothes. She was also diagnosed with multiple sclerosis (MS) and is now legally disabled, which he argues will affect her ability to care for the children.

### C. Parenting Skills and Willingness and Capacity to Provide Primary Child Care

¶20. The guardian ad litem treated "parenting skills" as a separate factor and then found that it favored Kirk. However, the factor is: "parenting skills and willingness and capacity to provide primary child care." The guardian ad litem created a new factor that she called: "Capacity to Provide Primary Child Care and Employment Responsibilities." She then found that both parents were equally capable of providing primary child care, that Amanda was unemployed, and that Amanda was always available to care for the children.

¶21. Amanda argues that, at times, Kirk has created a hazardous environment for the children by leaving his service revolver lying on the floor as well as lawn mower oil within the reach of the children. She also alleges that he refused to pay one-half of the children's medical bills. He also introduced the children to his girlfriend soon after the separation. Amanda submits that the guardian ad litem reports and testimony should be disregarded, as the guardian ad litem did not review all of the evidence as directed in the chancellor's order of appointment. Amanda concedes that no guardian ad litem report will be perfect, i.e., mentioning each and every material fact. However, she argues that the omissions in the

9

report are staggering and, therefore, the guardian ad litem's recommendation should not be considered. She contends her MS in no way prevents her from properly caring for the children. She further contends that since she is on disability she can provide care every day and, in the event that she is not feeling well, her mother is available to provide assistance. She notes that Kirk had to be court-ordered not to physically discipline the children, as he left welts on the children's backsides. Finally, she asserts that, during the time that she was given temporary custody, she was able to hone her parenting skills, making her a better fit for physical custody than Kirk, as he spent considerably less time with the children during that period.

¶22. Kirk contends that both parties presented evidence of good parenting skills, and both parties criticized the parenting skills of the other. Kirk admits that his schedule sometimes limits his time with his children, but he argues that his wife, Emma, or his parents are able to provide care and have a close bond with the children. He also points to the testimony of the guardian ad litem regarding his willingness to discipline the children, turn in the children's homework, and provide financially for the children.

> D. *Employment of the Parent and Responsibilities of that Employment*

¶23. The guardian ad litem did not address this factor as a separate factor. As discussed earlier, the guardian ad litem created a new factor that she called: "Capacity to Provide Primary Child Care and Employment Responsibilities" and simply found that both parents were equally capable of providing primary child care, that Amanda was unemployed, and that

10

she was always available to care for the children. She did not address Kirk's employment and the responsibilities of that employment as it might impact his ability to be a suitable parent to have physical custody of the children.

¶24. Since Amanda has no employment, she argues this factor weighs heavily in her favor. She further argues that Kirk's work schedule constantly changes, forcing accommodations to be made. She alleges that there were a lot of changes made to the visitation orders during the course of the proceedings in the trial court because Kirk's work schedule changed considerably. Being a policeman, Kirk does not have a regular 8:00-5:00 job. In fact, his schedule often changes due to such shift work; however, his change to a detective position has made his schedule more suitable for caring for the children. She notes that even though he has since adopted a more stable schedule, he still would not be available as she to care for the children. She also questions whether or not the guardian ad litem understood this factor.

¶25. Despite his admittedly non-conventional schedule, Kirk argues that he is still better able than Amanda to care for the children because, while she may be unemployed, she often depends on her mother to help care for the children. It is interesting that Kirk would make this argument about Amanda while admitting that sometimes his wife Emma helps care for the children because of his work schedule.

E.     *Physical and Mental Health and Age of the Parents*

¶26. The guardian ad litem did not rate this factor in either parent's favor. She noted that both parties were in their thirties and in good mental health. While acknowledging that she

11

has MS, Amanda points out that she is still able to take care of the children. Amanda contends that due to the progressive nature of her illness, she has a limited amount of time to enjoy her children. Therefore, she submits that this factor favors her.

¶27. Being a policeman, Kirk argues that he is in good mental and physical health. While Amanda is in good mental health, she does suffer from MS, which prevents her from being as active as she could be. However, despite suffering from MS, he concedes that Amanda's neurologist indicted that at this time she is still able to care for the children. In response to her assertion that she has "limited time" to enjoy the children, Kirk asserts that no evidence was presented at trial to conclude that her life was in jeopardy. He further points out that if her health were degenerating at such a rate, this factor would clearly not be in her favor.

### F. Emotional Ties Between Parent and Child

¶28. The guardian ad litem found that this factor weighs equally in both parties' favor. Amanda alleges that the children unequivocally indicated they wanted to live with her. She states that this should come as no surprise, because she had been their caregiver almost their entire life, as the divorce proceedings lasted almost as long as the marriage, and that during the extended proceedings she had custody of the children. In contrast, she argues that Kirk testified that the children are alienated from him. She also asserts that their son and Kirk do not get along, and for these reasons, this factor favors her.

¶29. Kirk asserts that both parents presented evidence with respect to their bond and relationship with the children, and witnesses testified with respect to each parent's good

relationship. The guardian ad litem's report states that the children were very attached to their mother. However, in the guardian ad litem's testimony, she agreed that the children were also attached to the father.

### G. Moral Fitness of the Parents

¶30. The guardian ad litem found that this factor favored neither party, as both Amanda and Kirk had had extramarital affairs during the marriage as well as after the separation but prior to the divorce. There was no testimony that Amanda had exposed the children to her paramour. However, Kirk did expose the children to his girlfriend and, in fact, lived with her for a while prior to their marriage. During that time, he continued to exercise his visitation. As a result, Amanda contends this factor favors her.

¶31. In response, Kirk, citing the evidence presented by the guardian ad litem, states that both parents attend church with their children and teach the children the importance of morals. As such, this factor is neutral.

### H. The Home, School, and Community Record of the Child

¶32. The guardian ad litem found that this factor favored Kirk. Amanda states that neither child had any significant home or community record; overall, however, the children did well in school for the six years she had custody of them. The one exception was that their daughter was held back in kindergarten. Amanda notes that during that year, she had to request an order preventing Kirk from using physical discipline on the children, which may have caused some of the issues their daughter was having in school. She also argues that the

13

guardian ad litem did not thoroughly investigate Kirk's girlfriend, especially with respect to the information she received from the children's school because his girlfriend worked there.

¶33. At the time of the trial, both children had been in Amanda's custody for approximately six years. Kirk points out that the school officials did not believe that the children were getting the help they needed from Amanda. He asserts that the guardian ad litem interviewed their daughter's first-grade teacher, school principal, and guidance counselor to verify the children's behavior in school.

### I. *Preference of the Child*

¶34. Because of the children's ages, both parties agree that this factor is not applicable.

### J. *Stability of Home Environment and Employment of Each Parent*

¶35. The guardian ad litem determined that this factor slightly favored Kirk, although she found that both parties provided a stable home environment. More specifically, she found that "the atmosphere at Kirk's [home] was very structured" and that it was "less structured" at Amanda's. She noted that the children did their homework before going out to play when they were at Kirk's home. She noted that during the two visits that she made to Kirk's home, it was clean and well kept. She stated that Amanda's home "was not as clean, but not to the extent that it would be hazardous for the children to live there." She pointed out that Amanda had several cats and a dog and that she "was somewhat concerned as to the number of cats," but she acknowledged that Amanda informed her that Amanda regularly cleaned up after the cats.

14

¶36. Amanda argues that the guardian ad litem erroneously considered Amanda's health when looking at several of the *Albright* factors, resulting in unfair weight being assigned to this factor. She further argues that the guardian ad litem did not make a proper determination with respect to which party could provide a stable home environment, and that the guardian ad litem did not understand this factor, resulting in an incorrect application. In addition, she alleges that the court did not provide a summary of the guardian ad litem's recommendations in the opinion, which was error.

¶37. Both parties presented evidence that the children had a good relationship with both their maternal and paternal extended families, and Kirk submits that the evidence showed that both parties appeared to have dedicated themselves to their children's well-being. He acknowledges that the transfer of custody to him placed the children in a new environment, but points out that the children were not totally new to the environment because they had gained some familiarity as a result of the visitation in his home during the parties' separation. He further argues that the guardian ad litem was correct in concluding that this factor favors him, because he provides a more stable home environment than does Amanda. To Amanda's argument—that a summary of the guardian ad litem's report was not included in the order— Kirk responds that such a summary is only necessary in cases where a guardian ad litem is mandatory, and that the appointment here was not mandatory because of the absence of allegations of abuse or neglect.

¶38. As discussed earlier, Amanda timely requested that the chancellor make findings of

15

fact on the custody determination, and the chancellor stated that he would "provide a [f]indings of [f]act and [c]onclusions of [l]aw preserving his ruling on the issue of modifying custody by applying the custody provisions." Despite this statement, the chancellor never provided any explanation supporting his judgment. While Amanda has not specifically framed her issue on appeal as the failure of the chancellor to make the required findings of fact, we find her issue that the chancellor erred in his custody determination is broad enough to cover the issue of the chancellor's failure to make the required findings of fact since she specifically requested in her post-trial motion that he make them regarding his custody determination.

¶39. Rule 52(a) of the Mississippi Rules of Civil Procedure provides in pertinent part: "In all actions tried upon the facts without a jury the court may, and *shall* upon the request of any party to the suit[,] . . . find the facts specially and state separately its conclusions of law thereon." We find that pursuant to this rule, Amanda's post-trial request that the chancellor make findings of fact with respect to the custody issue was sufficient to require the chancellor to make such findings. Also, "the supreme court has determined that cases involving a determination of child custody . . . require specific findings." *Parra v. Parra*, 65 So. 3d 872, 876 (¶10) (Miss. Ct. App. 2011). "Our job as a reviewing court is only to evaluate whether the chancellor's decision was manifestly erroneous based on a proper analysis of each of the applicable *Albright* factors. This task becomes futile when chancellors fail to consider and discuss each factor when rendering decisions." *Id.*

16

¶40. Therefore, in light of Rule 52(a), and the directive from our supreme court that determinations of child custody require specific findings, and the failure of the chancellor to adopt, incorporate, or even discuss the guardian at litem's recommendations, we reverse and remand this issue to the chancery court.

## II. Civil Contempt

¶41. During the pendency of the divorce, the special master ordered Kirk to carry existing medical insurance on the children and Amanda. The special master further found that all medical expenses of the children not covered by insurance should be equally split between the parties. This temporary order did not require that bills be submitted or paid within a certain time frame. Amanda asserts that Kirk did not make the payments as ordered; thus, he should be subject to contempt and liable for attorney's fees.

¶42. Kirk responds that the decision to hold someone in contempt is determined upon the facts of each case and is a matter for the trier of fact. *Strain v. Strain,* 847 So. 2d 276, 278 (¶4) (Miss. Ct. App. 2003) (citing *Milam v. Milam*, 509 So. 2d 864, 866 (Miss. 1987)). In order for a citation of contempt to be proper, the contemnor has to "willfully and deliberately ignore[] the order of the court." *Id.* (quoting *Bredemeier v. Jackson*, 689 So. 2d 770, 777 (Miss. 1997)). The factual findings of the chancellor in civil contempt cases are affirmed unless manifest error is present. *Id*. (citing *Purvis v. Purvis*, 657 So. 2d 794, 797 (Miss. 1994)). Lastly, matters involving contempt will not be reversed when the chancellor's findings are supported by substantial credible evidence. *Id.* While Kirk admits he has no

17

proof that he paid the bills, he points out that the order by the court did not require that he pay the bills according to a certain time frame.

¶43. This Court has held that such contempt matters are committed to the substantial discretion of the trial court and that the chancellor is "infinitely more competent to decide the matter than [this Court]." *Varner v. Varner,* 666 So. 2d 493, 496 (Miss. 1995). In *Durr v. Durr*, 912 So. 2d 1033, 1039 (¶21) (Miss. Ct. App. 2005),

> [t]he chancellor found [James] Durr in contempt for failing to abide by the judgment of divorce which provided that he pay one-half of all bills for medical treatment of the minor child which are not paid by the provisions of a policy of medical and hospitalization insurance . . . . The chancellor further found that Durr was in arrears for medical costs in the amount of $4,102.39. Although Durr claim[ed] that he paid all medical, optical, and drug bills submitted to him by [his ex-wife, Beverly] Hale, during the hearing he could only provide proof that he had paid one bill. As a result, we [found] that the chancellor did not err in finding Durr in contempt for failing to pay his share of [his son James] Waid's medical expenses.

Unlike *Durr*, the chancellor in this case found that "insufficient *evidence* was provided by Amanda for the [court] to hold Kirk in contempt." (Emphasis added). As such, based on our deferential standard of review, we cannot say that the chancellor abused his discretion when he failed to find Kirk in contempt, although we might have found differently had we been the fact-finder.

¶44. Amanda's final argument is that the chancery court erred in not holding Kirk in contempt for exposing the children to his then girlfriend, in violation of the provision of the first temporary order, which prohibited the parties from exposing their children "to any person [with whom] they may be romantically involved. Further, neither party shall have

18

overnight guests of opposite sex not related by blood or marriage." Amanda alleges that based on Kirk's testimony, he violated this provision of the temporary order.

¶45. In response, Kirk argues that there was no evidence to prove that he "willfully and deliberately ignored the order of the court." He further argues that in *Durr*, the appellant contended that the chancellor erred in failing to find the appellee in contempt of a visitation provision. *Id*. In that case, the chancellor dismissed the claim of contempt, and this Court declined to disturb the chancellor's exercise of discretion. *Id*. at 1040 (¶23). Here, during Kirk's testimony, he did admit that the children met Emma, but he alleges that it was only with the consent of Amanda.

¶46. Based on our review of the record, it does not appear that the issue of contempt based on Kirk having exposed the children to his then girlfriend was presented to the chancellor for a decision. The final judgment on the remaining issues indicates that the parties stipulated to all of the remaining issues that had not been decided by the chancellor during the protracted litigation that spanned six years. The issue of contempt related to Kirk's alleged failure to pay certain medical expenses. Therefore, we decline to address this aspect of the contempt issue.

¶47. In summary, we find that the chancellor did not undergird his custody determination with findings of fact as required by our jurisprudence and by our rules when specifically requested by a party. We acknowledge that in the final judgment on the remaining issues that the chancellor issued on May 22, 2015, he mentioned that the January 5, 2015 judgment, in

19

which he granted custody of the minor children to Kirk, was based on the recommendation of the guardian ad litem. However, the chancellor did not discuss the findings of the guardian ad litem. Of particular interest is the fact that the guardian ad litem's recommendation in her initial report was that the parties receive joint custody, but in her updated report, the recommendation was that physical custody of the children should be awarded to Kirk. It appears that the only thing that changed between the guardian ad litem's initial report and her updated report was that Kirk had married his girlfriend and finally had a house of his own. The record reflects that during the first five years of the proceeding while Amanda had temporary custody of the children, Kirk was living with either his girlfriend or his parents.

¶48. For the reasons discussed, we remand the issue of custody to the chancery court for specific findings with respect to the *Albright* factors. Upon application of those factors, the court is free to change the award of custody previously made if it determines that would be in the best interest of the children, although a new hearing is not required.

¶49. **REVERSED AND REMANDED.**

**LEE, C.J., BARNES, CARLTON, GREENLEE AND WESTBROOKS, JJ., CONCUR. GRIFFIS, P.J., CONCURS IN PART WITHOUT SEPARATE WRITTEN OPINION. ISHEE, FAIR AND WILSON, JJ., CONCUR IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**