# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-01094-COA

MICHAEL WILLIAMS                                                    APPELLANT

v.

CHANTELLE HANLEY WILLIAMS                                           APPELLEE

DATE OF JUDGMENT:                    07/05/2018
TRIAL JUDGE:                         HON. ROBERT GEORGE CLARK III
COURT FROM WHICH APPEALED:           MADISON COUNTY CHANCERY COURT
ATTORNEYS FOR APPELLANT:             FRANKLIN ALAN GARRISON
                                     HEATHER MARIE ABY
ATTORNEY FOR APPELLEE:               CHRISTOPHER A. TABB
NATURE OF THE CASE:                  CIVIL - DOMESTIC RELATIONS
DISPOSITION:                         AFFIRMED - 03/17/2020
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE BARNES, C.J., WESTBROOKS AND McCARTY, JJ.

### McCARTY, J., FOR THE COURT:

¶1.     The Madison County Chancery Court granted Chantelle Williams a divorce from Michael Williams for habitual cruel and inhuman treatment. The chancery court also awarded Chantelle sole legal and physical custody of the couple's two minor children. Michael now appeals from the chancery court's grant of the fault-based divorce and custody determination.

¶2.     Finding that the chancery court was not manifestly wrong or clearly erroneous in granting the divorce and sole custody to Chantelle, we affirm.

### FACTS

¶3.     Michael and Chantelle Williams were married in Adams County, Mississippi. There

were two children born of the marriage. After thirteen years of matrimony, Chantelle filed a complaint for divorce on the ground of habitual cruel and inhuman treatment. Michael responded by denying Chantelle's allegations and filing a counterclaim requesting custody of the couple's minor children. The four years since their separation have been acrimonious.

¶4. Contemporaneously to filing her complaint for divorce, Chantelle sought, and was granted, a domestic-abuse protection order against Michael. The order prohibited Michael from contacting either Chantelle or their children. Shortly after, the couple agreed to modify the order and allow Michael to have visitation, while Chantelle retained sole physical custody. The modified order stipulated that neither party was permitted to take the children out of the country, estrange the children from the other parent, or discuss the aspects of the case with the children.

¶5. A year later, the chancery court appointed a guardian ad litem to represent and protect the interests of the minor children. During this time the children had been in the physical custody of Michael for approximately one year, despite the court order granting custody to Chantelle. Not long after his appointment, the guardian ad litem filed a motion for contempt against Michael. The chancery court found that Michael had failed to cooperate with the guardian ad litem and had also discussed the litigation with the children. The chancery court considered placing the children in the custody of the Department of Human Services due to Michael's flagrant disregard for the court, obstruction of the guardian ad litem's investigation, and his constant, intentional interference in the children's relationship with their mother. Michael had also failed to return Chantelle's clothing and passports per the

2

order. As a result of the chancery court's findings, Michael was found in contempt, and he was incarcerated in the Madison County Jail for two days.

¶6. The guardian ad litem subsequently asked to be discharged from the case. In his motion, the guardian ad litem alleged that in addition to his failure to cooperate, Michael had repeatedly threatened and harassed the guardian ad litem, the guardian ad litem's family, Chantelle's former counsel, and others involved in the case. The guardian ad litem requested to be discharged due to fears for his and his family's safety.

¶7. A recorded conversation between Michael and the guardian ad litem was presented to the court. In the recording Michael can be heard telling the guardian ad litem that he hoped the guardian ad litem's family members would get cancer and that the guardian ad litem deserved for his wife to die. When discussing his frustrations with the guardian ad litem and the court, Michael stated he understood why Timothy McVeigh "leveled the federal [building]."

¶8. An emergency order was entered shortly thereafter. Michael had refused to allow the guardian ad litem to meet with the children alone and refused to have the children psychologically evaluated. He also openly discussed the litigation and his hatred for Chantelle in front of the children. Michael repeatedly used racial slurs to describe the chancellor, and made more threats to the guardian ad litem. In granting the emergency order, the court placed the children in the sole custody of Chantelle. Michael was not permitted to contact the children without approval by the counselor and the guardian ad litem.

¶9. The court then found Michael in contempt for a second time. Michael had taken the

3

children outside of the United States in contravention of the court's order. Further, Michael continued contacting the children after a no-contact order was entered. Michael had also failed to return Chantelle's personal property, including her passports from the United Kingdom and New Zealand. Michael was to be incarcerated until he reimbursed Chantelle for her personal property and returned her passports.

¶10. The court simultaneously entered yet another order of contempt against Michael. The third contempt was for his failure to cooperate with and pay the guardian ad litem. Michael was held in contempt until he paid the money owed to the guardian ad litem and petitioned the court for release.

¶11. Michael represented himself at trial. After hearing all the proof, the chancery court entered a judgment granting Chantelle a divorce and sole legal and physical custody of the parties' children. The chancery court found that Chantelle had proven habitual cruel and inhuman treatment by providing evidence of Michael's controlling, abusive behavior and its negative effect on Chantelle's health.

¶12. The chancery court went on to address custody of the children. After conducting a thorough *Albright*[1] analysis the court found that it was in the children's best interest for Chantelle to have sole physical and legal custody.

¶13. Aggrieved by the lower court's decision, Michael now appeals.

**ANALYSIS**

¶14. Michael asserts two assignments of error on appeal. First, he argues the chancery

---

[1] *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983).

court erred in awarding Chantelle a divorce on the ground of habitual cruel and inhuman treatment because her testimony was uncorroborated. Second, Michael argues the custody award should be reversed.

> **I.**     **The chancery court did not err in granting Chantelle a divorce on the ground of habitual cruel and inhuman treatment.**

¶15.   Michael argues that the chancery court erred by granting Chantelle a divorce on the ground of habitual cruel and inhuman treatment. He alleges that the chancery court erroneously relied on Chantelle's uncorroborated testimony.

¶16.   "We apply a limited standard of review when examining a chancellor's decision in domestic-relations matters." *Littlefield v. Littlefield*, 282 So. 3d 820, 824 (¶5) (Miss. Ct. App. 2019). "We review the facts of a divorce decree in a light most favorable to the appellee, and unless the chancellor's judgment was manifestly wrong, clearly erroneous, or based on an erroneous legal standard, the judgment should stand." *Id.* (internal quotation marks for citations omitted).

¶17.   A divorce may be granted to an injured party on the ground of habitual cruel and inhuman treatment, including spousal abuse. Miss. Code Ann. § 93-5-1 (Rev. 2018). Cruel and inhuman treatment is defined as "conduct that either: (1) endangers life, limb, or health, or creates a reasonable apprehension of such danger and renders the relationship unsafe for the party seeking relief, or (2) is so unnatural and infamous as to render the marriage revolting to the non-offending spouse, making it impossible to carry out the duties of the marriage, therefore destroying the basis for its continuance." *Littlefield*, 282 So. 3d at 824 (¶8); *see also Russell v. Russell*, 157 Miss. 425, 128 So. 270, 272 (1930). To succeed on this

ground, "there must be a causal connection between the treatment and the actual or threatened harm to the claimant's health or well-being." *Littlefield*, 282 So. 3d at 824 (¶8).

¶18. Spousal abuse under this ground may be established by showing "[t]hat the injured party's spouse engaged in a pattern of behavior against the injured party of threats or intimidation, emotional or verbal abuse, forced isolation, sexual extortion or sexual abuse, or stalking or aggravated stalking . . . if the pattern of behavior rises above the level of unkindness or rudeness or incompatibility or want of affection." Miss. Code Ann. § 93-5-1.

¶19. "Upon review, we must employ a subjective standard, rather than an ordinary, reasonable person standard, understanding that the impact of the conduct on the complaining spouse is crucial." *Littlefield*, 282 So. 3d at 827 (¶19) (internal quotation marks omitted).

¶20. Chantelle testified at trial that Michael was both physically and mentally abusive and that his behavior caused Chantelle to fear for her safety. Michael had threatened to shoot Chantelle and often expressed his desire for her to die. He even admitted in his testimony that he had said, "[T]he only resolution to this is for [Chantelle] to die and for the children to get her social security[.]" Chantelle's fear of Michael is so great that she sought and obtained a domestic-abuse protection order against him.

¶21. There was also testimony about Michael's sexual abuse. Chantelle described how Michael attempted to sexually assault her on multiple occasions. Chantelle described one attack wherein she reached for the phone to call for help, but Michael ripped it out of the wall before she was able to use it. During another attack, Michael held her hands down to restrain her while he attempted to sexually assault her, only relenting because he was unable to get

6

an erection.

¶22.    Chantelle sought medical attention as a direct result of Michael's behavior.  She suffered from depression and suicidal ideation as a result of her abusive marriage to Michael. Chantelle provided her medical records showing that she had been treated for depression and attempted suicide.

¶23.    After the separation, Michael took all of Chantelle's shoes, clothing, and passports. Chantelle testified that "[t]here was nothing left in the wardrobe [with] which to clothe [herself]."  The court ordered Michael to return Chantelle's personal items.  The unrefuted testimony is that Michael only returned one single shoe from each pair that Chantelle owned and threw the shoes' mates out with the garbage.  Michael only returned her United States passport.  At the time of trial, Michael had yet to return her United Kingdom and New Zealand passports.

¶24.    Michael also sold Chantelle's jewelry that she had inherited from her grandmother, which was worth around $30,000.  During a recorded conversation, Chantelle confronted Michael about selling the jewelry.  Instead of denying that he had sold it, he responded, "I needed the money."  The jewelry was never returned to Chantelle, and so the chancery court assigned its value to Michael during the equitable division of the marital assets.  Michael's award was lowered by $30,000.  He did not appeal or challenge this judgment.

¶25.    Likewise, Michael exerted financial control over Chantelle.  Both parties testified that Michael removed Chantelle's name from their joint checking account—the account in which her money was deposited.  Michael then added their nine-year-old son as a signatory to the

account. When Michael would travel for work, Chantelle was required to get her own child's approval in order to have money.

¶26. Michael's controlling and threatening behavior was also evidenced in his interactions with the guardian ad litem. Michael threatened and harassed the guardian ad litem to the extent that he sought to be discharged from the matter—something he had never done in any prior case. In addition to threats, Michael attempted to control and impede the guardian ad litem's investigation. He refused to allow the guardian ad litem to meet with the children alone; he insisted on being present for every interaction.

¶27. During recorded phone conversations with the guardian ad litem, Michael expressed that he did not wish for Chantelle to be involved in the children's lives at all. He believed that Chantelle "doesn't deserve" to have a relationship with her children. Michael also stated, in the children's presence, that their mother had "abandoned" them. He continued to reinforce his desire that Chantelle die so that the children could receive her Social Security benefits.

¶28. Ultimately, the chancery court found that "[d]uring the course of the marriage, Michael Williams would constantly yell at Chantelle Hanley Williams, belittle her, and attempt to have sexual relations with her" and that this "behavior caused Chantelle Hanley Williams to seek and obtain medical treatment."

¶29. Mindful of our limited standard of review in domestic-relations matters, we "will not reverse a [chancery court's] decree of divorce unless it is manifestly wrong as to law or fact." *Reed v. Reed*, 839 So. 2d 565, 569 (¶13) (Miss. Ct. App. 2003). We find no error or abuse

8

of discretion in the chancery court's findings and conclusions.

¶30. Michael's core argument on appeal is that Chantelle's testimony regarding the habitual cruel and inhuman treatment was uncorroborated. Yet the statute defining the fault-based grounds for divorce was amended in 2017.[2] The Legislature eliminated the corroboration requirement and instead provided that "[s]pousal domestic violence abuse may be established through the *reliable testimony of a single credible witness, who may be the injured party*[.]" Miss. Code Ann. § 93-5-1 (Rev. 2018) (emphasis added).

¶31. In its judgment, the chancery court explicitly found Chantelle to be a credible witness. In contrast, the chancery court found that "Michael Williams' demeanor, conduct, and testimony was, at times flippant, condescending, evasive and [] that Michael Williams lacked credibility as a witness." This finding explicitly echoes the statute. *See also Littlefield*, 282 So. 3d at 825 (¶9) (holding that a grant of divorce on the ground of habitual cruel and inhuman treatment will be upheld where the chancery court's "main source of evidence came by way of [the wife's] sworn testimony").

¶32. Given the plain language of the statute, the overwhelming proof presented at trial, and our deferential standard of review, we find no error in the chancery court's judgment. Even though not required in this case, Chantelle's testimony was corroborated by the recorded conversations substantiating Michael's behavior, Michael's own testimony, and the testimony of the guardian ad litem. The grant of divorce is affirmed.

## II.    The child custody determination was proper.

---

[2] The divorce was granted on June 28, 2018. Therefore, the new version of the statute is applicable.

¶33. Michael challenges the chancery court's custody determination on two grounds. First, he contends that the custody order should be vacated due to perceived shortcomings in the chancery court's *Albright* analysis. Secondly, he argues that the chancery court impermissibly relied on the guardian ad litem's hearsay evidence in making its custody determination.

### A. The chancery court properly analyzed each *Albright* factor.

¶34. We have long held that "the polestar consideration in child custody cases is the best interest and welfare of the child." *Albright*, 437 So. 2d at 1005. To determine the child's best interest, the court weighs the following factors: (1) the age, sex, and health of the child; (2) "the continuity of care prior to the separation"; (3) the parenting skills of each parent; (4) "the willingness and capacity to provide primary child care"; (5) "the employment of the parent and responsibilities of that employment"; (6) the "physical and mental health and age of the parents"; (7) "emotional ties of [the] parent and child"; (8) the moral fitness of each parent; (9) "the home, school, and community record of the child"; (10) the preference of the child; (11) the stability of the home environment; and (12) "other factors relevant to the parent-child relationship." *Id*.

¶35. Michael relies on *Parra v. Parra*, 65 So. 3d 872 (Miss. Ct. App. 2011), and *Pelligrin v. Pelligrin*, 224 So. 3d 555 (Miss. Ct. App. 2017), to support his argument that the chancery court's custody determination should be reversed for failure to make findings of fact on each *Albright* factor. *Parra* and *Pelligren* hold that a "it is reversible error if the chancellor does not articulate the reasoning behind the finding for each *Albright* factor." *Parra*, 65 So. 3d

at 876 (¶10); *see also Pelligren*, 224 So. 3d at 563 (¶40). In *Parra* and *Pelligren*, we reversed the lower court's custody award for failure to analyze and apply each of the *Albright* factors to the facts of the case. *Parra*, 65 So. 3d at 876 (¶12); *Pelligren*, 224 So. 3d at 563 (¶40). In both of those cases, the lower court's judgment merely stated which parent was awarded custody with no mention of *Albright*, its factors, or even the best interest of the children. *Parra*, 65 So. 3d at 876 (¶11); *Pelligren*, 224 So. 3d at 559 (¶14).

¶36. This case is different. The chancery court in the present case carefully analyzed each *Albright* factor and provided support for its determination. "We will reverse a chancery court's decision regarding child custody determinations only when the decision of the trial court was manifestly wrong or clearly erroneous, or an erroneous legal standard was employed." *Martin v. Martin*, 282 So. 3d 703, 708 (¶15) (Miss. Ct. App. 2019) (quotation mark omitted).

¶37. Having found that the chancery court properly applied the correct legal standard and that its decision was neither manifestly wrong or erroneous, we find no error.

**B.     Michael failed to preserve his hearsay challenges for appeal.**

¶38. Michael takes issue with the chancery court's disposition of custody due to its alleged reliance on hearsay. Specifically, Michael argues the chancery court erroneously relied on the guardian ad litem's reports and testimony.

¶39. At trial, testimonial evidence was provided by Michael, Chantelle, and the guardian ad litem. The guardian ad litem testified to information he had collected during his investigation, as well as his first-hand knowledge and experience from interacting with the

family. Michael failed to contemporaneously object to those portions of the testimony that might have been subject to hearsay rulings. "As there was no contemporaneous objection to testimony based on hearsay, the trial court was not afforded an opportunity to rule on specific testimony on the hearsay evidence issue." *McDonald v. McDonald*, 39 So. 3d 868, 884-85 (¶54) (Miss. 2010). "The well-recognized rule is that a trial court will not be put in error on appeal for a matter not presented to it for decision." *Id*.

¶40. We find that Michael failed to preserve this error for appeal, and it is therefore without merit.

## CONCLUSION

¶41. The chancery court was not manifestly wrong or clearly erroneous and did not apply an erroneous legal standard. Accordingly, we affirm the chancery court's granting of divorce and sole custody to Chantelle.

¶42. **AFFIRMED.**

**BARNES, C.J., J. WILSON, P.J., GREENLEE, WESTBROOKS, TINDELL, McDONALD, LAWRENCE AND C. WILSON, JJ., CONCUR. CARLTON, P.J., NOT PARTICIPATING.**